IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:22CR247 |
| vs. | |
| AARON CARDINALE, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 59). An evidentiary hearing was held on the motion on November 22, 2023. A transcript has been filed and the motion is ripe for disposition.

Having carefully considered all arguments presented, and for the reasons explained below, the undersigned will recommend that the motion be denied.

## FACTS

Omaha Police Officer Daniel Cleveland ("Officer Cleveland") testified at the evidentiary hearing in this case. (TR. 4.) Officer Cleveland has worked for the Omaha Police Department since May 2021. (TR. 4.) Before that, Officer Cleveland worked for the Lincoln Police Department, in Lincoln, Nebraska. (TR. 4.) Officer Cleveland began his employment with the Lincoln Police Department in May 2016. (TR. 4.) At the time of the events underlying this motion, Officer Cleveland was assigned to the Omaha Police Department's Uniformed Patrol Bureau, working the Southeast Precinct on the overnight shift. (TR. 4.) As a uniformed patrol officer, Officer Cleveland's responsibilities included responding to 911 calls, conducting traffic stops and investigating other violations of law. (TR. 4.) Officer Cleveland testified that he is trained to

detect indicators of possible drug activity, as well as to call for K-9's for assistance, which he routinely does. (TR. 14-15.)

On July 27, 2022, at approximately 2:00 a.m., Officer Cleveland and his partner, Officer Freyermuth, were in a marked cruiser located at South 13th and 13th Court, near a Casey's gas station, in Omaha, Nebraska. (TR. 4-5; TR. 7.) Officer Cleveland testified that they were patrolling in the area because the area is known for drug trafficking and stolen vehicles and their intent was to conduct proactive enforcement related to those types of violations. (TR. 5.) At the time, both officers were in uniform and equipped with body-worn cameras. (TR. 5-6; Ex. 1; Ex. 2.) The cruiser was also equipped with cameras. (TR. 6; Ex. 1; Ex. 2.)

While they were on patrol, the officers noticed a silver Chevy Malibu with Iowa license plates parked at the Casey's gas station. (TR. 6; TR. 27.) Officer Cleveland stated that after seeing the Malibu, they parked in a dark parking lot of a McDonald's to the north of the Casey's. (TR. 7-8; TR. 27.) Officer Cleveland did not know exactly how far away they were from the Malibu. (TR. 7-8.) The officers ran the plates on the Malibu and learned it was registered to an individual named Linda Loury ("Loury"), who had a suspended license. (TR. 7; TR. 27.) The officers learned that Loury had a criminal history for methamphetamine use. (TR. 7.) Officer Cleveland testified that Loury's name stood out to him because he was familiar with an individual named Mary Loury from his time as an officer with the Lincoln Police Department. (TR. 7.) Deputy Cleveland stated that Mary Loury was heavily involved in methamphetamine trafficking. (TR. 7.)

The officers watched the Malibu and waited for it to leave the Casey's. (TR. 7.) Officer Cleveland explained he wanted to further investigate what was happening. (TR. 7.) Officer Cleveland testified he saw a white male, who was later identified as Defendant, get into the driver's seat of the Malibu, and a frail female get into the passenger's seat. (TR. 7.) The Malibu turned left out of the road that leads into the Casey's and headed southbound on 13th Street. (TR. 7.) The officers followed the Malibu. (TR. 8; Ex. 2.) Officer Cleveland testified he did not know how much distance was between the cruiser and Malibu at that point. (TR. 37.)

Officer Cleveland, who was seated in the front passenger's seat of the cruiser, testified that as the Malibu approached Deer Park Boulevard, it increased its speed and made a right-hand turn to go west on Deer Park Boulevard. (TR. 7-8; Ex. 2.) Officer Cleveland did not know how much

2

distance was between the cruiser and the Malibu as they turned and traveled down Deer Park Boulevard. (TR. 9; TR. 37; TR. 38.) Officer Cleveland stated that as the officers were following the Malibu, he noticed it increase speed as it approached 15th Street, while it was still westbound on Deer Park Boulevard. (TR. 8; Ex. 2.) Officer Cleveland testified he did not know the Malibu's intended destination, but that the Malibu's acceleration was consistent with an attempt to evade police. (TR. 36.)

Officer Cleveland testified that while it was still westbound on Deer Park Boulevard, the Malibu's turn signal activated, and the Malibu immediately made a left turn onto 15th Street. (TR. 8; TR. 59; Ex. 2.) Officer Cleveland testified he did not know how much distance was between the cruiser and the Malibu as the Malibu turned left onto 15th Street. (TR. 42.) The cruiser camera shows that it took the cruiser about 20 seconds to go down Deer Park Boulevard and turn left. (Ex. 2.) Officer Cleveland also testified he does not know how much distance is between 13th and 14th Streets, or how much distance is between 14th and 15th Streets. (TR. 38.) Officer Cleveland stated that based on his training and experience, as well as years of working accidents, and general speed estimation and time, the signal activated less than 100 feet before the turn onto 15th Street, which is a violation of Nebraska law. (TR. 8; TR. 59.) Officer Cleveland testified that once the Malibu got on 15th Street, it abruptly turned into a driveway on the east side of the street. (TR. 9; Ex. 2.) Officer Cleveland stated he was not familiar with the driveway that the Malibu pulled into. (TR. 9.) Officer Cleveland testified the officers then activated the cruiser's overhead lights to notify the occupants of the Malibu that the officers were conducting a traffic stop. (TR. 9; Ex. 2.)

After the Malibu stopped in the driveway, Officer Freyermuth approached the driver's side of the Malibu, and Officer Cleveland approached the passenger's side. (TR. 9; Ex. 1; Ex. 2.) Officer Freyermuth explained that the traffic stop was for failure to signal the turn onto 15th Street more than 100 feet before the turn. (Ex. 1; Ex. 2.) Officer Freyermuth requested Defendant's license, registration, and proof of insurance. (TR. 10; Ex. 1; Ex. 2.) Defendant said he did not have a driver's license, but he was able to supply an ID. (Ex. 2.) Defendant told Officer Freyermuth that he lived in the house on the corner and pointed to it. (Ex. 2.) He also provided his address and telephone number. (Ex. 2.) Defendant told Officer Freyermuth that he did not have the plates of the Malibu turned over to him and that he bought it from Loury. (Ex. 2.) Defendant said he bought it from Loury about a month prior and that he did not have the bill of

3

sale with him. (Ex. 2.) Defendant also did not have proof of insurance with him, but provided a screen shot of proof of insurance from Loury. (TR. 13; Ex. 1; Ex. 2.)

Officer Freyermuth asked Defendant to open the door of the Malibu so he could see the Malibu's VIN number. (TR. 12; Ex. 1; Ex. 2.) Officer Cleveland testified he thought Defendant was nervous about that and, without prompting or being asked, Defendant said he did not consent to the search of the Malibu. (TR. 12-13; Ex. 1; Ex. 2.) Officer Cleveland testified that based on his training and experience, Defendant's behavior was consistent with individuals who are involved in criminal activity. (TR. 13.)

As Officer Freyermuth was speaking to Defendant, Officer Cleveland spoke with the passenger, who identified herself as Marian Wright ("Wright"). (TR. 10; Ex. 2.) Officer Cleveland testified that Wright displayed physical signs of methamphetamine use, which included poor dental hygiene, frailty, and a withered appearance. (TR. 10-11; Ex. 2.) Officer Cleveland asked Wright for her identification. (TR. 12; Ex. 2.) Wright retrieved her ID from a black backpack located near her feet on the floorboard of the Malibu. (TR. 12; Ex. 2.) Officer Cleveland thought it was suspicious that Wright only partially unzipped the backpack and meticulously dug in the bag for her ID to shield his view from the contents of the bag. (TR. 12.) Officer Cleveland testified Wright struggled to get her ID out of the bag because she made such an effort to not fully disclose the contents of the bag. (TR. 12; Ex. 2.) Officer Cleveland saw a knife in Wright's bag and asked her to give it to him, which she did. (Ex. 2.)

Officer Cleveland engaged Wright in small talk and asked her about her evening plans and what she was doing. (TR. 11; Ex. 2.) He asked her how she knew the driver and her relationship to Defendant. (TR 11; Ex. 2.) Wright said Defendant was her friend. (Ex. 2.) Officer Cleveland asked for Defendant's name, but Wright initially did not tell him. (Ex. 2.) Officer Cleveland testified he believed Wright was nervous about why he was asking about her relationship to Defendant. (TR. 12; Ex. 2.) Officer Cleveland stated he observed several indicators of criminal activity from Wright. (TR. 11.) Officer Cleveland explained that Wright moved around a lot, blinked slowly, trailed off as she spoke and murmured. (TR. 11; Ex. 2.) Officer Cleveland also stated Wright displayed nervous behavior by prolonging her responses to straightforward questions, looking around, and dropping her head. (TR. 12-13; Ex. 2.)

4

The officers instructed Defendant and Wright to stay in the Malibu, and then returned to the cruiser to run warrant checks on Defendant and Wright and review their criminal histories. (TR. 13; Ex. 1; Ex. 2.) From the checks, the officers learned Wright had a criminal history of intent to distribute methamphetamine, as well as possession, and that Defendant had a similar criminal history. (TR. 13.) The officers examined the Malibu's title and saw that the title did not have a date of sale. (TR. 13; Ex. 1; Ex. 2.) Officer Cleveland returned to the Malibu to clarify with Defendant if he bought the vehicle a month ago, as he originally said. (TR. 13; Ex. 2.) Defendant indicated he thought he purchased the Malibu a couple months ago then, after Officer Cleveland gave him a month reference, Defendant stated he bought it in March 2022. (TR. 13; Ex. 2.) Defendant stated he did not have insurance but that the Malibu was insured by Loury. (TR. 14; Ex. 2.)

Officer Cleveland returned to the cruiser and spoke to Officer Freyermuth. (TR. 14; Ex. 1; Ex. 2.) Officer Cleveland testified they were in the process of confirming what they had learned from the checks on their computer with the Police Information Channel operators, which is routine procedure. (TR. 14.) Officer Cleveland stated that Officer Freyermuth observed Defendant display nervous behavior and that they believed Defendant and Wright were engaged in criminal activity. (TR. 14.) Officer Cleveland stated that based on these suspicions, they called a K-9 to come to the scene to assist with the investigation. (TR. 14.)

Officer Cleveland testified that Deputy Andrew Kubik ("Deputy Kubik") with the Douglas County Sheriff's Office arrived on the scene 5 to 10 minutes later with his K-9, Rusty. (TR. 15; TR. 63-64.) Deputy Kubik, who also testified at the evidentiary hearing, testified that he has been with the Douglas County Sheriff's Office for 16 years. (TR. 61-62.) He is assigned to the K-9 unit and his responsibilities primarily include criminal interdiction on I-80, as well as K-9 related training. (TR. 62.) Deputy Kubik testified that he had been paired with Rusty for approximately a year and a half at the time of the traffic stop in this case. (TR. 63-64.) Deputy Kubik testified that Rusty is certified to detect marijuana, methamphetamine, cocaine, and heroin, and that Rusty was certified at the time of the traffic stop. (TR. 64.) Deputy Kubik stated Rusty was certified once after basic training, a second time on April 25, 2022. (TR. 64.) Deputy Kubik explained that because it is a yearly certification, Rusty was certified another time since April 25, 2022. (TR. 64.)

Deputy Kubik testified that he has deployed Rusty at numerous traffic stops and approximately a couple hundred times overall. (TR. 65.) Deputy Kubik stated that when Rusty indicates, Deputy Kubik often finds narcotics and that he considers Rusty reliable. (TR. 65-66.) Deputy Kubik stated he conducts regular training with Rusty and keeps Rusty's training records and deployment records. (TR. 69-70.) Deputy Kubik stated he did not provide Rusty's training and deployment records or certification to the prosecutor in this case because they were not requested. (TR. 71.)

Deputy Cleveland testified that when Deputy Kubik arrived on the scene of the traffic stop, they were still in the process of completing the citation. (TR. 15.) Deputy Cleveland stated the citation was for the signal violation, and for not having a valid driver's license or registration. (TR. 15.) Deputy Cleveland testified that when Deputy Kubik arrived, Officer Freyermuth took over completing the citation while he went to speak to Deputy Kubik. (TR. 16; Ex. 2.) Deputy Cleveland got out of the cruiser and spoke to Deputy Kubik about the situation. (Ex. 2.) Officer Cleveland told Deputy Kubik that Officer Freyermuth was working on completing the citation. (Ex. 2.) Deputy Kubik told the officers to complete the traffic stop and then ask for consent to search. (TR 63; TR. 66; Ex. 1; Ex. 2.)

Officer Cleveland returned to the Malibu and told Defendant and Wright that Officer Freyermuth was going to come over and talk to them. (Ex. 2.) Officer Cleveland continued to engage in small talk with Wright and Defendant. (TR. 16; Ex. 2.) Less than a minute later, Officer Freyermuth approached the Malibu and asked Defendant to step out of the vehicle, and Defendant complied. (TR. 16; Ex. 1; Ex. 2.) Officer Cleveland testified it is routine practice for officers to have individuals get out of their vehicles when issuing citations for officer safety. (TR. 16.) Defendant agreed to let Officer Freyermuth pat him down and reach into his pockets, where Officer Freyermuth found a large amount of cash. (TR. 16; Ex. 1; Ex. 2.)

Officer Freyermuth brought Defendant back towards the cruiser to explain the citation. (TR. 16; Ex. 1.) Defendant signed the citation and Officer Freyermuth asked for consent to search the Malibu, which Defendant denied. (Ex. 2.) Officer Freyermuth asked Defendant to step towards the rear of the cruiser, and Defendant complied. (Ex. 2.) Officer Fryermuth told Defendant he was not free to leave but he was not under arrest. (Ex. 2.) Officer Freyermuth told Defendant the officers had reasonable suspicion and that a K-9 was going to be run around the

6

Malibu. (Ex. 2.) Defendant asked Officer Freyermuth what the reasonable suspicion was, and Officer Freyermuth told him that if they found something during the search, that information would be in their documentation and that he did not need to tell him everything at that time. (Ex. 2.)

Officer Cleveland asked Wright to get out of the car, and then walked her back towards the cruiser. (TR. 16; Ex. 2.) Officer Cleveland testified that he did not hear the conversation between Defendant and Officer Freyermuth but that it sounded like Defendant was being argumentative and asking why a K-9 was going to be deployed. (TR. 17; Ex. 1; Ex. 2.) Officer Cleveland testified that he believed Defendant was fishing for information. (TR. 17.) Officer Cleveland told Defendant, "I know you're fishing for info, but we're not going to give it to you, so just be quiet and let us do our job." (TR. 17; Ex. 1; Ex. 2.) Wright asked to sit down in the driveway, which she was allowed to do. (TR. 16; Ex. 2.) Officer Freyermuth asked Defendant if he wanted to sit while Deputy Kubik ran his K-9 around the Malibu. (Ex. 2.) Defendant said he did not want to sit and that he did not agree to the search. (TR. 21; Ex. 2.) Officer Freyermuth explained to Defendant that officers were not searching they were just running the K-9 around the Malibu. (TR. 21; Ex. 2.) Defendant and Wright were instructed to move to the other side of the street so the K-9 would not be distracted. (Ex. 1; Ex. 2.)

Deputy Kubik testified that after the other officers completed the stop and advised him that the driver would not consent, he deployed Rusty for a sniff of the Malibu. (TR. 66; Ex. 1; Ex. 2.) Deputy Kubik testified that, using a 15-foot lead, he brought Rusty to the rear of the Malibu and gave him his narcotic search demand. (TR. 67.) Deputy Kubik stated that as he got to the passenger's side of the Malibu, Rusty alerted, and then indicated to the odor of narcotics by sitting down and staring. (TR. 67; Ex. 1; Ex. 2.)

While the K-9 sniff was conducted, the officers spoke to Defendant and Wright about the reason for the traffic stop. (Ex. 1; Ex. 2.) Defendant asked the officers to explain what he did and said he knew he had his turn signal on. (Ex. 1; Ex. 2.) The officers clarified that the violation occurred during his second turn onto 15th Street. (Ex. 1; Ex. 2.) While it is hard to hear from the video, Defendant said "Well, I guess" and did not appear to argue about the violation as it related to his turn onto 15th Street. (Ex. 1; Ex. 2.) Deputy Kubik then returned with Rusty and advised the officers that there was a positive indication and probable cause to search. (TR. 17; TR. 68-69; Ex. 1; Ex. 2.)

7

Officer Cleveland advised Defendant and Wright that there was probable cause to search the Malibu. (Ex. 1; Ex. 2.) Officer Cleveland told them that the K-9 alerted to the presence of controlled substances in the vehicle. (TR. 18; Ex. 1; Ex. 2.) He instructed Defendant and Wright to stay with the other officers while the Malibu was searched. (Ex. 1; Ex. 2.) Officer Cleveland and Deputy Kubik searched the Malibu. (TR. 18; Ex. 2.) Deputy Cleveland located methamphetamine in a container in Wright's black bag, which was in the passenger's side area of the Malibu. (TR. 18; Ex. 2.) The bag also contained a loaded syringe. (TR. 18; Ex. 2.) Officers located marijuana in the center console and methamphetamine in the trunk. (TR. 18-19; Ex. 2.)

Officer Cleveland testified that once the methamphetamine was found in Wright's bag, he advised the officers who were with Wright that Wright was going to be under arrest. (TR. 20; Ex. 1; Ex. 2.) After he found the methamphetamine in the trunk, Officer Cleveland advised the other officers that Defendant was under arrest. (TR. 20; Ex. 1; Ex. 2.) Wright and Defendant were handcuffed and placed in separate cruisers. (TR. 20; Ex. 1; Ex. 2.) Officer Cleveland testified that Defendant and Wright were not under arrest before the methamphetamine was located. (TR. 20-21.)

Officer Cleveland went to the cruiser and told Defendant that based on what they found, he was confident Defendant could be charged federally so it would be a good idea for Defendant to be honest and cooperative. (TR. 23; Ex. 2.) Defendant told him twice that he did not have anything to say. (TR. 23; Ex. 2.) Defendant was informed he was under arrest and provided his *Miranda* advisement. (TR. 22; Ex. 2.) Officer Cleveland testified that Defendant did not tell him he wanted a lawyer or invoke his Fifth Amendment rights. (TR. 23.) After Defendant was placed under arrest and advised of his *Miranda* rights, Officer Cleveland asked him to confirm his address. (TR. 21-22; Ex. 2.) Officer Cleveland testified he asked him to do so because many of the houses in that area were split into apartments with different units. (TR. 21-22; Ex. 2.) Officer Cleveland testified this is routine procedure. (TR. 22.) Officer Cleveland testified that whenever they arrest someone, they get their name, birthdate, address, and phone number. (TR. 22.) Defendant told him he lived in Unit 3. (TR. 21; Ex. 2.) Officer Cleveland testified that he did not interrogate Defendant and that Defendant did not make any incriminating statements. (TR. 23.)

Officer Cleveland testified that he was familiar with Defendant's residence before the traffic stop. (TR. 9.) Officer Cleveland explained he was familiar with Defendant's residence

because he had observed a lot of traffic to the residence in the spring and summer months. (TR. 9.) Officer Cleveland testified that, based on his training and experience, the traffic was indicative of narcotic activity. (TR. 9-10.) Officer Cleveland stated that a detective with the Lincoln Police Department had also told him that an investigation which resulted in the seizure of a large quantity of methamphetamine had led the Lincoln Police Department to a source of methamphetamine on 15th Street—within the block radius where Defendant lived. (TR. 10.) Officer Cleveland stated that he did not know the exact address, but the Lincoln Police Department were able to determine through vehicle tracking that the suspect in its investigation was on that half of 15th Street. (TR. 10.)

Officer Cleveland testified he asked Defendant for consent to search his phone following his arrest and after advising him of his *Miranda* rights, but Defendant denied this request. (TR. 22; Ex. 2.) Defendant's and Wright's phones were seized. (TR. 57; Ex. 2.) Officer Cleveland testified that Officer Freyermuth later secured a search warrant for Defendant's phone, and Officer Cleveland secured a search warrant for Wright's phone. (TR. 57.)

## DISCUSSION

### A. Traffic Stop

Defendant's counsel argued at the evidentiary hearing that the traffic stop was unlawful because there was no probable cause to believe there was a traffic violation. It is well-established that a "police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v Andrews*, 454 F.3d 919, 921 (8th Cir. 2006). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*. "The determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999).

"Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Gadson*, 670 F. App'x 907, 908 (8th Cir. 2016) (quotation omitted). This is true "even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (quotation omitted). "Courts are

9

not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).

Having heard the testimony and reviewed the evidence submitted, the undersigned finds there was probable cause for the traffic stop. The evidence shows the officers could have reasonably believed that there was a fair probability that a traffic violation occurred, specifically, that Defendant did not signal a turn 100 feet before the turn. This is a violation of Neb. Rev. Stat. § 60-6,161. The video comports with Officer Cleveland's testimony, which was that, based on his training and experience, as well as years of working accidents, and general speed estimation and time, the signal was activated less than 100 feet before the turn. Although Officer Cleveland was unable to assign distances between certain points, the undersigned believes Officer Cleveland testified credibly and that he reasonably believed he observed a traffic violation. Therefore, there was probable cause for the traffic stop.

### B. Reasonable Suspicion

Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356.

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably [warrant] suspicion that a crime [is] being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). In assessing whether the requisite degree of suspicion exists, a court must "determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *Id.* "The totality of the circumstances—the whole picture—must be taken into account." *Id.*

10

"[B]oth innocent and criminal acts can create reasonable suspicion." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted). Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Beck*, 140 F.3d at 1136 (quotation omitted). However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." *Id*.

Based on the totality of the circumstances, the undersigned finds there was reasonable suspicion for Defendant's continued detention following the traffic stop. The officers encountered Defendant at 2:00 a.m. in a high crime area. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis."). Both Defendant and Wright had criminal histories involving methamphetamine. The evidence also shows that Defendant and Wright exhibited unusual behaviors. Defendant's unsolicited statement that he did not consent to a search of the vehicle when Officer Freyermuth was only attempting to get the vehicle's VIN was indicative of someone trying to hide something. Wright's nervous behavior also contributed to the officers' suspicions. As reflected on the video, Wright moved around a lot, blinked slowly, trailed off as she spoke and murmured. She prolonged her responses to straightforward questions and initially would not provide Defendant's name. Wright seemed to be avoiding eye contact by looking around and dropping her head. Wright also struggled to get her ID out of her bag because she appeared to be trying to shield the bag's contents from the officers' view.

The circumstances surrounding ownership of the Malibu were also suspicious. The officers knew that the vehicle was registered to Loury, who was a known user of methamphetamine. Defendant indicated he purchased the vehicle from Loury, but he did not have a bill of sale. He also provided inconsistent answers about when he purchased the vehicle. At one point he stated he bought the vehicle a couple months earlier, but then later claimed the purchase occurred in March 2022—around four months before the traffic stop. Defendant also did not have insurance for the vehicle. It was still insured by Loury. Considering the totality of the circumstances, the undersigned finds there was reasonable suspicion for the detention.

Defendant also contends in his briefing that his pat-down after he exited the Malibu was improper. This argument is unpersuasive. "Law enforcement officers may take several steps to

11

protect their safety during a traffic stop, such as ordering occupants out of a vehicle, performing pat-down searches for weapons, detaining individuals, and using force." *United States v. Maluoth*, No. 8:22-CR-255, 2023 WL 3882718, at *3 (D. Neb. June 8, 2023). "Officers may conduct a protective pat-down search for weapons during a valid stop . . . when they have objectively reasonable suspicion that a person with whom they are dealing might be armed and presently dangerous and criminal activity might be afoot." *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) (internal quotation omitted). Defendant agreed to the pat-down. Additionally, the officers had an objectively reasonable suspicion that Defendant could be armed and dangerous, and that criminal activity might be afoot. The traffic stop occurred at 2:00 a.m. in a high crime area. Also, officers had already observed a knife in Wright's bag. There was nothing improper about the frisk.

### C. Probable Cause to Search

As discussed above, there was reasonable suspicion to detain Defendant for a dog sniff. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 954-55 (8th Cir. 2007). "A drug detection dog is considered reliable when it has been trained and certified to detect drugs." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) (quotation omitted).

Deputy Kubik testified that he had been paired with Rusty for approximately a year and a half at the time of the traffic stop in this case. Rusty was certified at the time of the stop. Rusty is certified to detect marijuana, methamphetamine, cocaine, and heroin. Deputy Kubik stated Rusty was certified once after basic training, a second time on April 25, 2022, and another time since that date. The certification occurs yearly. Rusty has been deployed at numerous traffic stops and approximately a couple hundred times overall. Deputy Kubik testified that when Rusty indicates, he often finds narcotics. The undersigned finds the officers had probable cause to search the Malibu based on Rusty's alert and indication.

### D. Miranda

*Miranda* warnings are required when an individual has been subjected to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). However, most routine traffic

stops do not trigger the need for *Miranda* warnings, and an individual temporarily detained pursuant to an investigatory traffic stop is not in custody for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). A detained motorist is entitled to the protections prescribed by *Miranda* only if the treatment he is subjected to during the stop renders him "in custody" for practical purposes. *Id.* at 440. *Miranda* warnings must be given prior to any "custodial interrogation," which includes "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

Defendant argues the statements he provided to officers both before and after his *Miranda* advisement should be suppressed. However, there are not any incriminating statements to suppress. At the evidentiary hearing, defense counsel could not pinpoint any incriminating statements made by Defendant. Moreover, upon review of the evidence, the undersigned likewise could not identify any incriminating statements. To the extent Defendant argues the officers' request for his address was intended to elicit an incriminating response, and Officer Cleveland ignored Defendant's invocation, the undersigned rejects this argument. "[A] request for routine information necessary for basic identification purposes is not interrogation under *Miranda,* even if the information turns out to be incriminating." *United States v. McCaughlin*, 777 F.2d 388, 391-92 (8th Cir. 1985). Officer Cleveland testified that obtaining an arrestee's name, birthdate, address, and phone number is routine procedure. It is clear from the evidence that Officer Cleveland's request for this information was simply a means to confirm Defendant's contact information. This question was not meant to elicit an incriminating response.

Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter that Defendant's Motion to Suppress (Filing No. 59) be denied.

Dated this 10th day of January, 2024.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.